# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**BONNIE MAXSON,**

       **Plaintiff,**               **CIVIL ACTION NO. 2:06-CV-14429**

    **vs.**

                            **DISTRICT JUDGE DAVID M. LAWSON**

**COMMISSIONER OF**              **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:**     Both Plaintiff's and Defendant's Motions for Summary Judgment should be DENIED, and the instant case remanded for further proceedings.

***

      Plaintiff filed an application for Disability Insurance Benefits on July 17, 2002, alleging that she had been disabled and unable to work since February 26, 2002 due to depression, anxiety and fibromyalgia (TR 47-49, 66). The Social Security Administration denied benefits (TR 34-38). A requested *de novo* hearing was held on November 3, 2004 before Administrative Law Judge (ALJ) Neil White, who subsequently found that the claimant was under a disability and therefore entitled to disability benefits for a closed period of time from February 26, 2002 through November 1, 2004 (TR 19-23). The ALJ determined that as of November 2, 2004 claimant underwent medical improvement related to her ability to perform work-related activities, regained the residual functional capacity to perform work with some restrictions and was able to perform her past work (TR 23). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. The parties have filed Motions For Summary Judgment and the

issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was forty-six years old at the time of the administrative hearing, has a high school education and a managerial accounting degree, and previously worked as a word processor, secretary, accounting clerk and bookkeeper. (TR 19, 67, 75, 328). Plaintiff has not engaged in any substantial gainful activity since the February 2002 onset date of her disability. Plaintiff began seeing her treating psychiatrist in December 2001 (TR 20 and 147). Plaintiff complained of chronic harassment at her job and problems with concentration and fatigue (TR 20 and 147). Plaintiff eventually went on long-term disability (TR 187).

In a Pain Questionnaire dated October 20, 2002 Plaintiff indicated that she has pain located in the "[h]ead, neck, shoulders, arms, elbows, wrists, hips, knees, ankle, feet, chest, lower abdominal, [and] back." (TR 86). She also indicated that she has had recurrent respiratory infections since moving to a new work location in 1996 or 1997 (TR 86). She complained of flashes and blurriness in her eyes, nausea, acid reflux, migraines and panic attacks (TR 86). She indicated that the pain is caused by "anything" having to do with work and is further aggravated by the "people at work." (TR 86). For her symptoms she takes Amerge, Tylenol 3 and Vioxx, which allegedly cause her dizziness, lethargy and upset stomach (TR 87). She indicated that her condition affects her ability to walk and she sometimes uses a cane to "curb knee pain" and provide balance (TR 88). In a Daily Activities Report Plaintiff indicated that she does not need help with personal needs and grooming, she is able to do some laundry and vacuuming and prepare simple meals such as pizza, frozen dinners and peanut butter toast (TR 89).

At the administrative hearing, Plaintiff testified that her medications make her tired. She also testified that there is a medication for her to take if she gets "really nervous" however, she thinks that it sometimes makes her "more emotional." (TR 341). She has problems sleeping at night and wakes up frequently, sometimes due to the pain, sometimes due to things "on [her] mind." (TR 341). The ALJ noted in the record that her hands were shaking during the hearing. (TR 342). He questioned her about Dr. Iwanow's reports that in August of 2002 she was having physical problems with tremors and flashing lights in her vision. (TR 342). Plaintiff described the flashing lights as "lightening bolts" in her left eye that go through her vision. (TR 342). Plaintiff testified that she can walk up to 30 minutes but she will be "worn out" afterwards. (TR 342). She guessed that she could probably lift 10 or 15 pounds. (TR 342). She stated that she gets headaches 4 to 5 times a week and she takes Tylenol 3 if it's a "normal headache" but if it hurts a lot she may take more than the usual dosage. If the headache is a migraine, she will take Amerge, or if it's a particularly bad migraine, she will take Amerge and Tylenol 3. (TR 343). About her pain Plaintiff states that "it's kind of all over" and "it does its own thing." (TR 343).

Plaintiff further testified that her husband does the grocery shopping because she gets "panicky" and the task can be overwhelming (TR 344). During the day she gets her daughter ready for school, then takes her to and picks her up from school (TR 344). Around the house she will "try to straighten out things like the mail that piles up or, . . . try to go through things like that" but that she will start something and will not usually finish it. (TR 344).

During the administrative hearing, a vocational expert testified in response to the following hypothetical question posed by the ALJ:

Let's assume that we have a person the age of Ms. Maxson, identical in vocational education and background. Assume that she had the following limitations: Assume that she should be in a job where she could avoid forward flexion, bending over forward; a job that would not involve any significant twisting or bending at the waist and trunk; a job where she could avoid elbow flexion greater than 90 degrees on the left, 10-pound lifting limitation. With those limitations, could she return to past relevant work?

(TR 346). The vocational expert testified that she could return to her past relevant work with the exception of one assignment that Plaintiff described wherein Plaintiff was seated at a low front desk and had to lean forward to communicate with the clients and then stretch and twist to communicate directly with her co-workers seated elsewhere in the office (TR 249, 334, 346). The vocational expert testified that generally secretarial and bookkeeper positions would fall within the restrictions posed by the ALJ. (TR 346).

## MEDICAL EVIDENCE

On January 18, 2001 physiatrist Alexander Iwanow, M.D. diagnosed Plaintiff with fibromyalgia (myofascial pain syndrome) and left cubital tunnel syndrome (TR 228). On January 19, 2001, Dr. Iwanow gave Plaintiff the following written restrictions:

(1) Avoid sustained forward flexion (Bent over forward)
(2) Avoid twisting/bending of waist/trunk
(3) No elbow flexion >90˚ on left
(4) Recommend (sic) desk top elevation
Dx Fibromyalgia

(TR 227).

Dr. Iwanow reports that prior to the January 2001 visit, he saw Plaintiff from April 1990 to October 1991 (TR 228). Dr. Iwanow's April 1990 office evaluation states that Plaintiff was being evaluated for claimed "persistent pain in the upper back, shoulders, neck, head and left chest" which Plaintiff attributed to an automobile accident in 1988 (TR 239). Dr. Iwanow's diagnostic impression

at that time was posttraumatic myofascial pain syndrome, probably cubital tunnel syndrome on the left and possible 11th cranial nerve injury, with a note to "rule out long thoracic nerve injury." (TR 240). Dr. Iwanow noted some concern with atrophy he detected on Plaintiff's left medial shoulder area (TR 240). Dr. Iwanow discussed treatment protocols with her for myofascial pain syndrome (TR 241). He noted that he was "very happy to see that this patient is working. Very often distracting activities are very good for blocking out pain for short periods of time." (TR 241).

Plaintiff started seeing psychiatrist Sachin Nagarkar, M.D. in December 2001 for depression and anxiety. (TR 68). Dr. Nagarkar stated in his psychiatric consultation dated December 19, 2001 that Plaintiff "has problems with her neck, back, knee, and eyes. At the job she is working she has to turn and twist and they know her restriction, but they still make her do that job at the front desk." (TR 147). She complained to Dr. Nagarkar that her job had been "awful" for the past couple of years. "I feel like I am always the one that everyone picks on" (TR 147). Plaintiff complained that she had several miscarriages and the people with whom she works were totally unsympathetic to her problems (TR 147). She complained of several instances of harassment and claimed that the harassment changed her personality (TR 147). She obsesses about it, is more irritable and worries a lot (TR 147). She feels frustrated, gets startled easily and cannot relax (TR 147). She has initial insomnia, some anhedonia, and some self deprecation (TR 147). She noted fatigue, problems with concentrating and remembering, and has a hard time making decisions (TR 147). At the time, her current medications were Prozac 10 mg, Alegra, Vioxx and Singulair (TR 147). Dr. Nagarkar concluded with a diagnostic impression of Generalized Anxiety Disorder (TR 148).

On January 28, 2002 Plaintiff returned to Dr. Iwanow for reassessment and discussion regarding her restrictions. Plaintiff reported that she continued to have a lot of pain and, although

her job generally honored her physical restrictions, one of the duties in her job required that she "do a lot of neck and trunk twisting to look behind her and to talk to people behind her" and this was increasing her symptoms (TR 225). She reported difficulty sleeping at night and restless leg movements (TR 225). Dr. Iwanow concluded that Plaintiff was stable at that time and reviewed her restrictions with her (TR 225).

On April 8, 2002 Dr. Nagarkar stated in a letter addressed "To Whom It May Concern" that "[i]t is my clinical opinion that Bonnie will never be able to return back to work." (TR 248). On October 23, 2002 Dr. Nagarkar noted that Plaintiff had to go for "IMO's" (independent medical opinions) and it "stirred up" her tension again (TR 246). She could not sleep, she was anxious, had muscle tension and had difficulty making decisions (TR 246). She had "anticipation anxiety" about going back to work (TR 246). She stated "I know I just cannot face those people. It makes me angry what they did to me. The issues there haven't changed - to go back to that job would be impossible." (TR 246). Dr. Nagarkar noted that she "has become totally isolated." (TR 246).

On October 21, 2002, Plaintiff underwent a mental status examination with Kenneth T. Morris, Ph D (TR 187-193). Dr. Morris observed "[h]er hands shook almost nonstop during the interview, as did her legs. The question is whether this is EPS symptomatology or anxiety related symptomatology. Client was very punctual, sat erect, and maintained good eye contact." (TR 189). Plaintiff reported that she has been treated with medication for depression and anxiety (TR 187). She reported that on a daily basis, on a 1-10 scale, her depression ranked about a nine, but had dropped to a seven or an eight as a result of medications prescribed by Dr. Nagarkar (TR 188). She also reported cervical dorsal dysfunction as a result of the car accident in 1988 and fibromyalgia (TR 187). She further reported that she suffers from migraines, has problems with both knees (her left

was rebuilt), has a degenerative eye muscle, has a serious vision problem in her left eye, and suffers from bronchitis (TR 187).

Dr. Morris noted that there were no psychotic features of Plaintiff or thought process problems. He found her to be "very verbal," especially as it related to describing the work situation that led to her depression, anxiety and feelings of humiliation (TR 190). "She maintained very good eye contact, was spontaneous and well organized." (TR 190). Dr. Morris stated "[s]ome of the signs of depression are that the client isolates herself, she cries fairly often, and indeed cried throughout the interview at various times, . . . ." (TR 190). He found that she showed relatively severe depression and exhibited anxiety both verbally and through her body movements (TR 191). She was self-effacing, very insecure and has low ego strength (TR 191). Dr. Morris diagnosed her with severe Major Depressive Disorder without psychotic features, Acute Stress Disorder, Avoidant Personality Disorder, Dependent Personality Disorder, cervical dorsal dysfunction, fibromyalgia, knee difficulties, migraines, degenerative eye muscle, and bronchitis. Dr. Morris noted the following psychological stress factors: Occupational problems, economic problems, and other psychosocial/environmental problems, with a GAF score of 50 (TR 192). He concluded that her prognosis was "[p]oor, without psychiatric supervision" and that she needed medications as warranted and counseling/psychotherapy (TR 193).

On August 13, 2002 Plaintiff returned to Dr. Iwanow. He noted that she had not been to see him since January 28, 2002, and that he was following her for the diagnosis of fibromyalgia (TR 223). Upon physical examination, he noted that she had some "vague complaints of pain in the neck and shoulder areas" with only "mild tenderness" palpated in the lower thoracic spine and no tenderness in the neck or low back area (TR 223). They spent more than half of the session

reviewing the diagnosis of fibromyalgia and some of Plaintiff's other symptoms (TR 223). Dr. Iwanow attributed many of her symptoms to anxiety (TR 223). He recommended that she stay on the Paxil and Trazodone and he would see her again in four months (TR 223).

From February 2002 through June 2006 Plaintiff regularly attended therapy with Deborah Hastings, MA., LLP (TR 186, 299). On nearly every progress note, the therapist noted the "Clinical Status (nature & severity)" as "stable, open." The progress notes indicate that Plaintiff generally talked about her worries and concerns and any recent developments in her life. Plaintiff testified that at these sessions she often discussed the prior work situation that caused her such mental anguish (TR 338).

On November 23, 2004 Dr. Nagarkar noted that Plaintiff had not heard from "retirement & SSD." (TR 253). He noted that "the state had five witnesses to testify against her" and the "S.S.D. hearing seemed to have gone okay." (TR 253). Plaintiff reported to Dr. Nagarkar that she and her husband found some property near Kawkawlin and they were working on the house plans. (TR 253). Per Dr. Nagarkar's notes, she was getting along better with her husband (TR 253). The record indicates that Plaintiff continued to see Dr. Nagarkar through March 2005 (TR 294).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although the Plaintiff met the disability insured status requirements, had not engaged in substantial gainful activity since her alleged onset date, suffered from depression, a personality disorder and fibromyalgia, all severe impairments, she did not have an impairment that met or equaled the Listing of Impairments (TR 22). The ALJ found Plaintiff's assertions regarding her ability to work prior to November 2, 2004 credible, found she could not perform the requirements of her past relevant work prior to November 1, 2004 due to a combination of mental

and physical problems, and concluded she was under a disability from February 26, 2002 through to November 1, 2004. (TR 23). The ALJ further found that as of November 2, 2004 the claimant underwent medical improvement related to her ability to perform work-related activities and she regained residual functional capacity to perform work with physical restrictions, including her past work as a secretary and therefore, claimant's disability ceased as of November 2, 2004 and she was not disabled again through the date of the ALJ's decision. (TR 23).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts").

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *Id.* § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question

accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Nagarkar, a treating physician, for the period after November 2, 2004, when Dr. Nagarkar opined that she was permanently disabled. Next, Plaintiff argues that the ALJ failed to properly evaluate the medical records and therefore, the hypothetical question that the ALJ posed to the VE failed to comprehensively describe Plaintiff's limitations.

Having reviewed the entire record, the Court is persuaded that the ALJ's decision was not supported by substantial evidence for the following reasons.

Plaintiff argues that the ALJ's decision that Plaintiff was not disabled after November 1, 2004 was not supported by substantial evidence. Specifically, Plaintiff asserts that Dr. Nagarkar's opinion was not afforded proper weight and consideration as a treating physician. On April 8, 2002, Plaintiff's treating physician Dr. Nagarkar stated in a letter addressed "To Whom It May Concern," "[i]t is my clinical opinion that Bonnie will never be able to return back to work." (TR 248). Plaintiff argues that the ALJ's decision is inconsistent because it relies on Dr. Nagarkar's opinion that Plaintiff "will never be able to return back to work" for the time period from February 26, 2002 through November 1, 2004, yet it does not rely on the same opinion for the period beginning November 2, 2004. Therefore, argues Plaintiff, the ALJ was required to explain why he did not rely on Dr. Nagarkar's opinion for the period of nondisability from November 2, 2004 forward.

It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.

Although it is proper for the ALJ to give a treating physician's opinion controlling weight in accordance with the Social Security Administration Regulations, the Regulations do not afford the same deference to opinions on an issue reserved to the Commissioner, such as a final determination of "disabled" or "unable to work." Dispositive administrative findings relating to the determination of a disability are within the purview of the Commissioner.

(e) . . . Opinions on some issues, . . . are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

20 C.F.R. 404.1527(e). The ALJ "is not required to accept the treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Commissioner of Social Security*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also Niemasz v. Commissioner of Social Security*, 155 Fed.

Appx. 836, 839 (6th Cir. 2005) ("A treating physician's disability conclusion cannot bind the Commissioner, who retains authority to decide the ultimate issue of disability.").

Dr. Nagarkar's statement and opinion that Plaintiff "will never be able to return back to work" was a conclusion on an issue properly reserved to the Commissioner. Although the ALJ relied on this statement as part of the evidence by which he found Plaintiff was disabled from February 26, 2002 through November 2, 2004, he did not err in making his own administrative findings regarding Plaintiff's disability and ability to return to work.

Once a claimant has been awarded disability benefits, an ALJ must find that there has been a medical improvement in the beneficiary's condition before terminating the claimant's benefits. Title 42 U.S.C. § 423(f) provides:

> A recipient of benefits under this subchapter . . . based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by –
>
> (1) substantial evidence which demonstrates that –
>
> > (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
> >
> > (B) the individual is now able to engage in substantial gainful activity; or
>
> (2) substantial evidence which –
>
> > (A) consists of new medical evidence and a new assessment of the individual's residual functional capacity, and demonstrates that –

(I) although the individual has not improved medically, he or she is nonetheless a beneficiary of advances in medical or vocational therapy or technology (related to the individual's ability to work), and

(ii) the individual is now able to engage in substantial gainful activity, or

(B) demonstrates that –

(I) although the individual has not improved medically, he or she has undergone vocational therapy (related to the individual's ability to work), and

(ii) the individual is now able to engage in substantial gainful activity;

42 U.S.C. § 423(f)(1)-(2). Any improvement in the beneficiary's impairment meets the statutory standard for medical improvement. *See* 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(c)(1). To determine whether medical improvement has occurred, the severity of the beneficiary's current medical condition is compared to the severity of the condition "at the time of the most recent medical decision" that the beneficiary was disabled. *See* 20 C.F.R. § 404.1594(b)(7).

Here, the ALJ was required to compare the severity of Plaintiff's condition on November 2, 2004, with her condition prior to that date, when the ALJ determined she was eligible for benefits. The ALJ applied the proper point of comparison standard as required under the law. The ALJ was required only to look at the evidence before and after the ending date of disability to determine if Plaintiff's condition had improved such that she was capable of engaging in substantial gainful activity. The question here is whether there was substantial evidence to support the ALJ's determination that after November 1, 2004, Plaintiff was no longer disabled.

To determine whether the improvement was related to the individual's ability to work, the

residual functional capacity at the time of the prior decision is compared with the new residual

functional capacity. *See* 20 C.F.R. § 404.1594(c)(2). The ALJ made the following determination:

> The claimant is unable to perform the requirements of her past relevant work prior
> to November 1, 2004.
> . . .
> Based on an exertional capacity for sedentary work, and the claimant's age,
> education, and work experience, a finding of disabled is directed by medical
> vocational rule 85-5p prior to November 2, 2004.

(TR 22-23).

The ALJ then determined that as of November 2, 2004 there was medical improvement in

the Plaintiff's condition related to Plaintiff's ability to work (TR 23).

> [A]s of November 2, 2004, the record confirms the claimant underwent medical
> improvement related to her ability to perform work-related activities.
>
> As of November 2, 2004, the claimant regained the residual functional capacity to
> perform work with no significant twisting of the waist or of the truck (sic) with no
> forward flexion and no flexion of the elbow greater than 90 degress with a 10 pound
> lifting restriction.

(TR 23). The Court does not find that this determination is supported by substantial evidence.

First, the ALJ determined that

> [T]he record confirms the claimant underwent medical improvement related to her
> ability to work. The record confirms that leading up to November 1, 2004, the
> claimant sought only periodic treatment with Dr. Nagarkar about once every 2
> months. He noted as of November 23, 2004, the claimant had settled her worker's
> compensation claim (Exhibit 15F, page 1). That claim had been a major stressor in
> her life. As of December 1, 2004, it was noted the claimant's condition was now
> "stable" (Exhibit 16F). While the claimant still required restrictions for her
> fibromyalgia, her depression and anxiety had essentially resolved (based on the
> medical evidence).

(TR 21). Although the ALJ noted that the claimant's worker's compensation claim had been a

"major stressor in her life," Dr. Nagarkar's November 23, 2004 notes state only that claimant

"Settled WC" (worker's compensation) (TR 253).  The physician's notes contain no indication that this relieved a "major stressor" in Plaintiff's life that resulted in a medical improvement related to her ability to work (TR 253).

The ALJ also relied on therapist Deborah Hastings's December 1, 2004 note that Plaintiff's condition was "stable."  (TR 21).  However, a review of the record reveals that the therapist used the term "stable" in the "clinical status" portion of each and every set of Progress Notes for sessions with Plaintiff as far back as March 18, 2003.   (TR 270-293).

The ALJ states that "While the claimant still required restrictions for her fibromyalgia, her depression and anxiety had essentially resolved (based on the medical evidence)."  (TR 21).  The ALJ does not identify the medical evidence in the record on which he relies for this finding. Furthermore, there is no mention in the record that Plaintiff's depression and anxiety had essentially resolved.

Next, the ALJ determined that "[a]s of November 2, 2004, the claimant has mild limitations with respect to activities of daily living and social functioning with mild limitations with respect to maintaining concentration, persistence or pace with no repeated episodes of de-compensation for extended durations."  (TR 21).  There is no reference to supporting evidence in the record for these determinations and none is found in the record before the Court.

The ALJ's opinion lacks references to substantial evidence in the record for its conclusion that Plaintiff underwent medical improvement related to her ability to work as of November 2, 2004.  The ALJ's finding was not supported by substantial evidence and therefore the Court recommends remanding the instant action so that the ALJ may specifically cite to medical findings or other record evidence that support his determination.  If such an analysis alters the ALJ's

determination of Plaintiff's disability status, the ALJ must re-evaluate Plaintiff's disability status as of November 2, 2004. Accordingly, both Plaintiff's and Defendant's Motions for Summary Judgment should be denied and the instant case remanded for further proceedings consistent with this report and recommendation.

In light of these findings, the Court does not reach the question raised by Plaintiff asserting that the hypothetical question posed to the vocational expert at the hearing did not accurately describe Plaintiff.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 30, 2007                   s/ Mona K. Majzoub                
                                       MONA K. MAJZOUB
                                         UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July 30, 2007                   s/ Lisa C. Bartlett            
                                         Courtroom Deputy